Appellant 21-1142. If you're ready for me. Give your colleagues a chance to take their seats and then we'll let you start. So just one moment. We appreciate your enthusiasm, though. Good morning. May it please the court. Ian Hansen on behalf of Plaintiff Appellant Life Watch Services Incorporated. I'd like to reserve five minutes of my time this morning for a bottle if I could be granted. This court already has determined that the challenge conduct in this case, if proven, would violate the antitrust laws. That is not an issue today. What is at issue is whether that conduct was exempt altogether from antitrust scrutiny under the McCarran-Ferguson Act. Defendants bear the burden of establishing their McCarran defense. And to prevail here, they need to demonstrate both that the challenge conduct is part of the business of insurance and that it is regulated by state law. And do they also have to prove all three of the factors that inform whether something, whether some conduct is the business of insurance? Do they have to prove all three? Yes, Your Honor. We believe that those, well, I think the best way to answer this is defendants decided no case and we are aware of no case in which a court has held that the challenge conduct in the case meant any less than all three factors and still constituted part of the business of insurance. So with respect to that, I think that really does kind of demonstrate what defendants need to do here. They need to meet all three perino factors and they also need to demonstrate regulation by state law. I'd like to discuss first the business of insurance prong in the McCarran test. Perino controls here, those three factors you already mentioned, and I believe that perino simply outcomes as positive here because it applied those three factors to a closely analogous factual scenario practice and concluded that that practice was not part of the business of insurance. The first perino factor is that the conduct alleged must have the effect of spreading or transferring risk as between insurer and insured. On this risk transfer factor, perino makes clear several things. The first thing is that the risk transfer in the insurance context occurs by means of the insurance policy. So when an insured executes a policy, a certain measure of risk is transferred from insured to insurer. Perino also makes clear that the measure of the risk that is transferred in that moment is defined by the policy's express coverage terms. So you're saying the uniformity rule, since it's not in the express terms of the policy, has no bearing on the transfer of risk? That's correct, yes. But isn't it informing actually how the policy is implemented? Because the policy here says if applied to someone who has one of the conditions that needs this sort of diagnostic tool, we'll cover some, we're not going to cover others. Doesn't that transfer the risk? It doesn't. Your Honor, the problem with that argument... Okay, it does or it does not? It does not. The problem with that argument, Your Honor, is it relies on a premise that the perino case expressly rejected. And what's that? Which is that the transfer of risk occurs not when the policy is executed, but when the claim is settled. But here, when the policy is executed, there has been a business determination concerning how they're going to treat a certain diagnostic tool. Well, so the issue with that, Your Honor, is that, and it's really important to be discerning about the conduct alleged here, right? So what we are alleging is that the insurers issue policies, they expressly cover medically necessary health expenses, that is the measure of the risk transferred under perino. And during the claims handling process, then, the challenge conduct is the blue plans agreement to enact or defer to an outside body's recommendations in applying the terms of the policy to a particular claim. So to get more to the point, the problem is that those, that set of recommendations is not fixed or frozen in time. But it is, though, because in your complaint, you allege that if one of the blues don't cooperate and get in step with the plan, the uniform rule, they will be punished. So isn't it hard for you to reconcile what you just said with the complaints, allegations? No. And the reason is, again, so suppose, for example, Your Honor, you and I execute an insurance contract, right? At this time, in the background, you and Judge Nygaard and Judge Fischer, your insurers, let's say, okay, in the background, you have agreed that you will apply the terms of your contract, of the insurance contract to particular claims in accordance with a set of recommendations. The problem is that those set of recommendations are never fixed. So it may be that that set of recommendations at the time that I execute the policy, which, by the way, does not mention these recommendations at all, recommends against or for covering treatment X. I may execute the policy. I hate to tribble you, and we're not doing your antitrust case here, but you call them recommendations. You are saying that is the antitrust conduct, that there is a horizontal conspiracy to apply that rule. So I think, to be fair to your complaint, how can you call it a recommendation? Well, Your Honor, I think the reason so that – sorry. I guess I'm not quite understanding your question. How can we call – Well, you just said this recommendation we're not going to cover telemetry. Yeah. You said the recommendation, but that's the core thrust of your case, is there's been a preexisting agreement among the Blues that we're not covering it. So I don't think it's really fair to say it's a recommendation that arises at the claim processing phase. Well, the issue – so, first of all, this Court already has sort of recognized this. The structure of the alleged conduct is as follows. Subscriber executes contract with Blue Plan. The Blue Plan, under the contract, has discretion in determining whether a particular claim falls within the policy's coverage terms. That decision is the Blue Plan's. It is not the Association's, and it is not other – it's not the decision of other Blue Plans either. Right? So at bottom, the decision whether to cover a claim remains entirely the Blue Plan's. Now, it can – it has – the rule is that they need to substantially comply with the medical policy as a whole. That means, right, that there may be deviations as to particular treatments from the model medical policy. Okay? So – and so I think that the key here is to, again, focus on the insurance policy. Carino makes clear that that is the risk transfer instrument. Now, consider a different case. Okay? Consider, for example, the Blue Plans got together and decided, you know, for X and Y reasons, we just don't think that telemetry is worth the cost or it's uninsurable, whatever, right, something like this. They jointly decided together to issue a policy expressly excluding telemetry cardiac monitors from coverage that otherwise reaches medically necessary health expenses. So suppose this case, right? I'm the subscriber. I receive the policy. It includes an express exclusion. By the way, this policy has been approved by the state in which it's been issued. I sign and execute that risk transfer instrument with an express understanding that the risk I am transferring to the Blue Plan is medically necessary health expenses minus telemetry in all circumstances. That would be a textbook risk transfer case, but that is not this case. The policies do not mention telemetry. They do not mention the Blue Plan's intention to rely on or enact the association's recommendations during claims handling. Even though from your complaint, the insurer made a decision we're not covering telemetry. Right. So the insurer made a decision on its risk transfer. We've already determined this isn't medically necessary, so we're transferring the risk to you, insured person, if you choose to have this tool as opposed to the options. So I think you're getting to an important question. The Blue Plans could all independently determine that claims for telemetry that are submitted to them are not medically necessary under the terms of their policies. What they cannot do is collude to all decide to do that. Isn't that the theory of your antitrust case? Yes, it is. Okay. All right. But I guess you're going to let Mr. Coleman address some of this. Sure. I mean, the second prong, I think, is of equal importance here, regulated by the state. And you're talking, you made a good description here, the difference between exclusion and the uniformity rule here. But this uniformity rule, blues acting in concert with the blue association, is essentially what you're saying, and there's a level of collusion between the 19 blues that are involved here. Wouldn't the insurance commissioners of the various states be familiar with the fact that there's discussion among the respective blues, and by not doing anything would say, you know, we're not going to interject ourselves here. That's something you have to do in the implementation of your policy and determination of what's covered and what isn't covered. I think the key point here, with respect to the state regulation prong, the text states, right, I'm just going to go to the text. It says, the antitrust laws shall apply to the extent, I'm sorry, the antitrust laws shall apply to the business of insurance to the extent that such business is not regulated by state law. So I think this compels a really simple rule, and I think it answers your question, right? If a particular practice is part of the business of insurance, it is still exempt only if that practice is regulated by state law. So I think that the issue here is assuming state sort of knowledge of a particular practice and then crediting lack of action as regulation simply runs contrary to the statute, which says that the antitrust laws apply where there is no regulation. And I think that it would, it's a strained reading at best to conclude that lack of regulation is actually regulation. I see my time is up, and I'll see you again on rebuttal unless there's another question. We'll see you on rebuttal. Thank you. May it please the Court, Patrick Kuhlman on behalf of the United States. I'm here today because the district court adopted a sweeping and erroneous interpretation of the McCarran-Ferguson antitrust exemption. The exemption requires, the exemption applies only if, among other conditions, the state in question regulates the particular practice alleged to violate federal antitrust law. So is it the United States' position that the clause in the Act only applies if it is specifically, the state law specifically addresses that particular practice, which for this case is denying coverage for telemetry? If the state law doesn't speak to that specific practice, you don't have something regulated by the state. Is that the government's position? No, Your Honor. The statute or other regulatory measure must cover the challenged conduct, but the text of the statute itself need not expressly mention that practice. So here, for example, the state regulation element doesn't require a statute or regulation that says, ensures they'll not agree to deny coverage of telemetry monitors. There can be slightly general wording that covers practice. And let me offer an example. Assume that a state regulates the price of insurance, and an insurer is required to charge reasonable rates, and the insurer has to file supporting documents with the insurance commissioner, establishing that the rates aren't excessive, but also the rates are sufficient to sustain the insurer, to make sure that it's able to pay claims in the future. If a plaintiff alleged predatory pricing, I think there would be a strong case that there is state regulation, even though the particular regulatory measures don't say predatory pricing. Okay. Well, in each of the states that are identified in the complaint, they seem to all have statutory provisions that deal with unfair practices or deceptive practices. Doesn't the type of conduct described in the complaint here be the type of conduct that could be regulated by those sorts of pronouncements? So we're not taking a position on the meaning of any particular state statute, and we're not taking a position. Then tell us, then, what is the United States' test? If you think the district court's test was wrong, what's the test for when something is regulated by state? If you could give us the words you want us to type in an opinion. Sure, sure. The state must regulate the particular practice alleged to violate federal antitrust law. How do you reconcile that particular practice with FTC versus national casualty, where the Supreme Court says a general regulation of deceptive advertising in that case was sufficient to satisfy? Our precedent in Travelers versus Blue Cross or Western PA, where we said a scheme, the existence of a scheme in itself is sufficient? How do we get around that? And that's the challenge from, I think, the government's point of view. I understand why you're taking the position you're taking, but as soon as you say particular conduct, it seems to run right against this binding precedent. Yeah, so we have a different reading of national casualty. So in that case, the Supreme Court found that there was state regulation because, and here I'm quoting, found state regulation because the states in question, and here I'm quoting, regulated those practices challenged by the FTC. The FTC alleged that the defendants were engaged in false, misleading, and deceptive advertising. The states in question had statutes that prohibited unfair and deceptive acts generally, and then there was specific provisions addressing false advertising practices. And I won't try to quote the exact provisions addressing false advertising, but they're in our brief at page 16, footnote 6. Okay, so let's go back. You talked about unfair practices or unfair acts were some of the regulatory or statutory available authorities to control the conduct. So I understand the complaint here. The conduct here is essentially, hey, defendants, you aren't covering what we say and what everybody else says is medically necessary. Doesn't that constitute the type of unfair act that could be pursued under state law? So this is really, it's our position that this isn't the question you can address in the abstract. You can't say do unfair trade practice statutes generally prescribe this type of conduct. The analysis is case specific. You'd have to look at the statute in a particular state and analyze that statute to see whether it covers the practice. And I think Your Honor is referring generally to the unfair trade practice statutes that many states have. They vary in the particulars, but I think in most cases there's two prohibitions. There's a prohibition on unfair methods of competition. There's a prohibition on unfair and deceptive acts. Then there is a specific enumeration of practices, only one of which relates to competition. And that particular provision generally says something along the lines of concerted action or unilateral action that harms competition and involves boycott, coercion, or intimidation. It's a violation. So faced with a particular state statute, in determining whether that state statute addresses the particular conduct at issue, a court might have to decide a number of questions. It would have to look at that act and see whether that act actually reaches the practice, which could entail looking at the case law, looking at anything that the insurance department has done. I thought essentially the district court did, though. That big old footnote didn't have a lot of statutes. Yeah, the district court did produce a very lengthy list of statutes. Some of those were unfair trade practice statutes. Some of those were entirely unrelated conduct. So let me give you an example. So one of the statutes, a couple of statutes, New Hampshire statutes, that were cited both by the district court and by the defendants in their brief to this court. One required that insurance policy forms be in simple and concise language. The other one required certain formatting of insurance policies. So, for example, you have to use 10-point font in the form. So the district court cited and the defendants cited those statutes as evincing state regulation, saying that mandating readable insurance policy forms regulates. So you're quibbling with some of the authorities the district court relied upon, but you're not saying the district court erred in its entirety when it identified many different state laws that regulated the conduct that's alleged in this case. Or are you saying the district court whiffed on every single one? So we're not taking a position on any of the particular statutes. So what is the government's goal in representing an interest in this case? Tell us what it is. Yeah, our goal, and this is a very important goal to us, because, you know, the antitrust laws are the Magna Carta of free enterprise. They're important to. I get why you're here. I totally understand why a private civil dispute in the antitrust area could have a consequence on the government's enforcement priorities and activities. I get it. But tell us, then, what it is you think the district court did that's so concerning to the United States. What's concerning to us is the district court stated that unrelated or general regulation can satisfy the requirement. That's not what the statute says. That's not how this court and Supreme Court have applied it. And that essentially eviscerates the state regulation element. I think you're misstating what the statute says. The statute really doesn't say what regulated by the state means. The statute says it needs to be regulated by the state. Correct? Yeah. Okay. So the question for us is what does that mean? Yeah. So let me try to walk you through our reading of the statute. So the statute provides the federal antitrust law shall apply to the business of insurance to the extent that such business is not regulated by state law. Right. So let's focus on a couple of the key terms. There's such business and there's to the extent. So such business refers back to the business of insurance. And the business of insurance, as defined by the Supreme Court in Perrano, comprises particular practices meeting the court's three-part test. So the statute says the antitrust law shall apply to the extent that particular practices qualifying as the business of insurance are not regulated by state law. To the extent means the degree to which a thing extends. So federal antitrust law shall apply to the business of insurance to the degree that practices qualifying as the business of insurance are regulated by state law. There's no, the word practice is not in the McCarran-Ferguson Act. You're writing that. Respectfully, Your Honor, that's the term that the Supreme Court used in Perrano. In defining the business of insurance, the Supreme Court said it's particular practices meeting a three-part test. If they didn't say it, and I think what Judge Schwartz raised and I would raise it again, I just don't think that your reading of national casualty, I think your reading of national casualty is overly broad. Can I respond? You can respond. Okay, sure. So earlier, you know, I walked through our reading, you know, that the court identified the particular statutes. And I think the court is referring to and the defendants refer to the portion of the national casualty decision where the court is addressing the FTC's argument. The FTC argued that there was no state regulation because these acts haven't been effectively applied. So as the court understood the FTC's argument in that case, the FTC was saying there's a statute, but the insurance commissioner hasn't done anything, it hasn't enforced it, it hasn't issued any regulations, so that's not state regulation. The court rejected that argument. But in this case, but that proposition doesn't support the proposition that general or unrelated regulation satisfies a state regulation element. So are you asking us to make a collusion exception? No, Your Honor. We're asking you to apply the statute as we think it's written. Because certainly, as I know it, or at least as I think I know it, the insurance commissioners across the country don't typically regulate collusive conduct. There are specific areas, not only under the new act, CARERA, but there are certain areas where the sharing of information is permissible, right? That's correct. I think some states authorize that. But what you're saying here is this uniformity rule is a form of collusion, which is not regulated as a practice, it's not regulated by the insurance commissioners, and which could constitute an antitrust violation. So we're not taking any position on whether this conduct is a legitimacy antitrust law, and we're not taking any position as to whether the state regulation element is satisfied in this case. What we're here to advocate for is the reading of the state regulation element that it applies, it's satisfied only if the state regulates a particular practice at issue. And I'm sorry if I'm not responsive to your question. No, I understand. Thank you. That's helpful. I just had one question about the Comprehensive Health Insurance Reform Act. In the government's brief, you understand the government's taking the position they take no position on retroactivity? Is that correct? And if you have a position on whether it applies retroactively, I'd like to hear it. Oh, yeah. No, I'm sorry, Your Honor. We don't take a position on retroactivity, and we also don't take a position on the forfeiture argument. But we do think that if the court does apply chiro to any of the plaintiff's claims, it's inescapable that the exemption doesn't apply. If this conduct is the business of insurance, it's the business of health insurance as well, and thus outside of the exemption. Defendants don't contest that proposition. You mean if the new law applied? Yes, if the new law applied. I'm sorry. Thank you. All right. Thank you for your argument. Thank you. Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I'm arguing on behalf of the appellees today. I'd like to start with the business of insurance issues that Mr. Hansen argued, and then I'll turn to the state regulation issues that Mr. Hansen and Mr. Coleman just presented. And I want to start, Judge Schwartz, with your two questions to Mr. Hansen about the complaint, because I think what has happened over the course of briefing and now argument in this case is that the location of the conduct has slowly moved until later in the claims process. And I want to return you to, as you said, Judge Schwartz, what's actually alleged in the complaint. We are here on a motion to dismiss, and that's what we look at. And the complaint makes very clear, paragraphs 2, 4, 7, 8, 9, and I could go on, but I'll stop there, to explain that the complaint makes very clear that what the conduct is is an agreement in lockstep, that's paragraph 7, that telemetry services are never medically necessary. That's paragraph 8. More to the point, paragraphs 9 and 76 talk about the fact that doctors, when they are about to prescribe telemetry services, review in advance whether or not those services are covered. And one of the complaints in the complaint is that when doctors decide that telemetry is not covered by the blues, they don't prescribe it. So the transfer of risk that Mr. Hansen is talking about is not some momentary happening when the insurance contract is signed. This is something that is integral to the policy. Judge Schwartz, you asked a question about, you know, informing how the policy is implemented. And that makes this practice, this alleged practice of blanket denials of coverage for telemetry, something that is completely within the insurance contract itself, the key component of any business of insurance case. But how would the insured know that? I mean, your adversary point is there's nothing in the four corners of the policy, which is the instrument through which the transfer of risk occurs, that mentions the uniformity rule. I think that there are two responses. The first is, as you'll see from paragraphs 60 and 61 of the complaint, there actually are policies that are publicly available, I've found them, that talk about telemetry being excluded or included in certain circumstances and so forth. So, you know, insurance policies are already beastly long to begin with. If what Mr. Hansen is suggesting, which is that every single type of coverage that is excluded as not being medically necessary has to be listed within the policy, those policies would look like the OED. So what we're talking about is also not a question about the insurer's knowledge. That's not something that Perrano talks about, and it's certainly not something that the U.S. Supreme Court in FABE talks about. We heard a lot about Perrano, and I'll talk about how that case differs from this one. But I want to emphasize FABE because FABE gives the lie to the idea that the moment that matters is the risk transfer moment where the contract is signed. FABE talks about how the performance of a contract, the performance of the insurance contract is integral to the business of insurance. Even though FABE is dealing with a different clause of the statute? Yes. You believe we can look at FABE even though it was dealing with some other clause? I do, and I think a lot of courts have drawn on exactly that discussion in this particular context. Do you need to rely on FABE? Can you make your argument without it? If we say it's cabined to that clause? I can, and I think I can because of another question you asked in Schwartz, which is are these three components of Perrano kind of written in stone? What Perrano said was that those components are relevant to the analysis. You look at questions about risk transfer, integral to the relationship, whether all of the actors are within the insurance industry, and what we're talking about here is a quintessential risk transfer, so I'm not resisting that. What I'm saying is that the performance of the policy also matters. Of course it matters, and I want to contrast that with Perrano and Royal Drug and two other cases, the Tycor case from this court and the insurance brokerage litigation from this court. Before you talk about those cases, I think you just said you agree there is a risk transfer here. That's your position, there's a risk transfer there? Yes. Explain for us how is this a transfer of risk? It's a transfer of risk because of precisely what the plaintiffs say in their complaint, that there is an agreement among all of the insurers that they will not bear the cost of telemetry coverage, that insurance in all circumstances have to bear the cost of coverage. That is the whole basis for their collusion claim, as you pointed out, Judge Schwartz. But with respect to those other four cases I just mentioned, I think one rubric that might be helpful to this court is to think about this in terms of, is the conduct that's being complained of internal to the insurance relationship, part of the contract, or is the conduct that's being complained of external to that relationship? So take Tycor and the insurance brokerage litigation cases, and both of those, Tycor involved rate setting for things that weren't even insurance. It was title examination services. All of that happened before the insurance contract was signed. Insurance brokerage litigation involved steering of different potential insurance to insurers before the insurance contract was signed. So those were events that were challenged that were external to the insurance agreement itself. And then you've got Royal Drug and Parano. And in both of those, the conduct that was being challenged had to do with an agreement, a side agreement essentially, external to the contract. In Royal Drug, you had a situation where the insurer had struck a deal with a number of pharmacies and hadn't struck a deal with a number of others. And it was that separate collateral deal, a separate arrangement, as some courts call it, that was the basis of that claim there. Parano is very similar. Parano, that's why Parano relied so slavishly on Royal Drug. What Parano dealt with was a separate consulting agreement that the insurer had entered into with a chiropractors association to decide whether the claims of certain chiropractors were going to be covered or not. Chiropractic actually was covered under the Parano insurance policy in question. That side agreement had to do with whether chiropractors were unfairly rejecting the claims of certain other chiropractors whose practices or prices they disagreed with. So each of those sets of cases, the cases involving conduct before the policy, the cases involving conduct after the policy, those are the cases that the plaintiffs are going to again and again. But this case is strikingly different for the reasons that are set out in the complaint. This case involves the question about coverage under a policy. There's no preliminary conduct that's being alleged and there's no ex post conduct about some other separate arrangement. This is coverage under the policy. So if you look at some of the coverage cases that we talk about in our brief, and I'll point you to just a couple, the Anglin case from the Fourth Circuit involved an insurer's refusal to cover one party to a marriage and not the other. The insurer said it's a package deal. We cover both of you or none of you. It's a coverage decision. And that was found to be quintessentially the business of insurance. The McElhenney case out of the Eastern District of Pennsylvania, that was a case where the plaintiffs were forced to buy a type of coverage, a mechanic's lien coverage, as part of title insurance coverage. They were forced to buy coverage they didn't want. That was quintessentially the business of insurance. The Slagle case out of the Eleventh Circuit, insureds were denied coverage for windstorm damage unless they went to a particular state underwriter. The other insurers refused to offer windstorm coverage. All of those coverage cases are examples of quintessentially the business of insurance. And this is a coverage decision in a coverage case. It is quintessentially the business of insurance. And there's not a case on point to which the plaintiffs can point that makes exactly this type of distinction and finds it somehow outside of the very business of insurance. So I'm concerned about whether or not the uniformity rule and the blues conduct as it relates to it is regulated by the state. So let me turn to that, Judge Fischer. And I would begin by saying I think Mr. Coleman has made your task a little bit difficult. As Judge Schwartz, you pointed out, he's taking no position on the first business of insurance question. He's taken no position on whether or not this actually is state regulation. He's taking no position on KIRA, no position on forfeiture. But what he appears to want to do is to line it at the district court's brief, frankly, because the sentence with which the government appears to disagree in its brief is a sentence where the district court quotes Aretha and Hovenkamp, the Bible of antitrust law. The holding is the last sentence in the decision. And that sentence, of course, is backed up by dozens of cases, starting from 1959, 1958, all the way to the present, talking about what you need to find when you regulate insurance. Now, to the question about a particular practice, there is no case that holds that a state needs to regulate a particular practice. That's something I think the government would dearly want. And that's why the government's brief spends its first three pages just talking about the legislative history of the McCarran-Ferguson Act rather than talking about the case law. But what the case law says, starting from national casualty, going all the way up to the present time, is that when a state is present in a particular area of insurance, that that is sufficient. But let me bring the point forward. But what about our Owens? What about our decision in Owens? Yes. So Owens involved a number of different practices, including practices involving rate-making, allocation, I think, or selection of agents, decisions about coverage. And each of those were spoken to by the general health insurance regulations of the state. But here I would actually draw the exact parallel to this case, because here what you have is an allegation of collusive conduct. That collusive conduct, as at least one of you pointed out, is covered by, among other things, unfair trade practices and insurance statutes. And I will tell you, if you look at Joint Appendix 359 to 376, these are the dozens and dozens of insurance statutes that the defendants submitted below. And each of them, if you look at every state, each of them contains an unfair trade practice, unfair competition in insurance, or similar statute, and not just that, but extensive regulation of health insurance. Mr. Coleman mentioned the New Hampshire statute. The New Hampshire statutes that were cited in the Joint Appendix cover 250 subparts, and some of those subparts have sub-subparts. So this is not a New Hampshire regulation that just deals with font. But is the practice then, as you're saying, the practice at issue is collusive conduct, not the denial of telemetry coverage? How are you defining what practice is being regulated by state? What is it? I think the definition is important because what the plaintiffs argued below, and I'll quote this, is that the statute needs to deal with, quote, collusive agreements to deny telemetry, close quote. That is simply not the law. That's not even close to the law. A collusive agreement, which is the sort of thing that is alleged often, of course, in an antitrust case involving a health insurance company or companies, has to do with unfair conduct, unfair practices, unfair competition within the insurance industry. In addition, it has to do with, presumably, the way that rates are set, monitored, and forced by the insurance commissioner that administers the statutes in every state in which this is concerned. And I would challenge my friend, when he gets up for rebuttal, to point you to one case where a court has found that the state regulation of the insurance industry is so insufficient that it does not qualify for McCarran-Ferguson protection because there is not one case in which that can be said. So this court would be the first. And I would suggest that no matter what the district court could have redlined its brief differently, expanded on the footnote, the district court doesn't need to show its work to that extent. What the district court did was it consulted the 18 pages of statutes that were presented to it. It consulted the case law, which it cited in its decision, and it held that there was sufficient regulation in this case to qualify as state regulation under McCarran-Ferguson. So in this, you're saying as long as there's law, if the practice at issue is collusive contracts to deny telemetry, if there's statutory provisions that deal with collusive behavior, and or statutory provisions that deal with denials of what we'll call medically necessary services, as long as there's coverage there, it's regulated. Yes, I think that's right. I think that's the way to write it. The other signpost to look at is all of the states that have mandated benefits clauses. Of course, what the plaintiffs are complaining here is that they didn't get a benefit that they wanted. And there are lots of times where states impose on insurers the obligation to carry a particular benefit. So if states can do that, presumably a state, as has been done before in some of the administrative appeals that the plaintiffs talk about. But in the complaint, didn't the plaintiffs step forth a couple of examples of states requiring coverage? Exactly. That was the point that I was making, that there are circumstances where the state steps in and says, no, you are going to cover telemetry. So if the state can direct the telemetry be covered, the state can regulate in this area.  If there are no further questions. Okay. Thank you. Thank you, Robert. Any other questions? I'd like to make just a few points with respect to the business of insurance. Prong first. Ms. Stetson proposed a framing that I actually quite like. She said that the question is whether the practice is internal to the policy relationship or external to the policy relationship. I think we're quite comfortable with that framing. The key here, and this is a fundamental problem that defendants try as they may cannot solve, is that the challenge conduct in this case is a horizontal agreement between Blue Plans, other Blue Plans, and the association. That agreement, that conduct, is at all times unconnected to the relationship between the Blue Plan and the subscriber that derives from the policy. They cannot solve this problem. There is no, and so I think the problem is that repeatedly Ms. Stetson says, well, this transfers risk. Well, how can that be if the risk transfer instrument is the policy? How can it be that the Blue Plans can decide amongst themselves what the terms of the policy mean, what the scope of the risk transfer is without ever involving the subscriber from whom the risk is being transferred? They cannot solve this problem. There is no way around Perino. The problem with using FABE to try to get around Perino is that FABE expressly distinguishes Perino. So let's say, for example, right, that Perino sets out this territory as the business of insurance. We can argue whether FABE maybe adds another area or a different area, but what we cannot argue is that FABE, what defendants cannot do is try to use FABE to reach a result that would, in effect, overturn Perino here. With respect to the state regulation prong, Judge Fisher, you brought up the Owens case, and Ms. Stetson rightly pointed out that in that case, the challenge conduct was found to be regulated by specific New Jersey statutes. What Ms. Stetson did not mention was that this court in Owens made clear that if plaintiff had had evidence of concert of action outside of the area of concerted action that was actively regulated and authorized by the state of New Jersey, he may have had a viable claim. That is the correct application of the rule. If insurers engage in X, Y, and Z, and the state regulates only X, the antitrust laws continue to apply to Y and Z. By contrast, the district court's rule, under which any state regulation of any aspect of the business of insurance suffices to trigger the exemption, you have a regulatory gap result, right? The state regulation of X would exempt the insurers from the antitrust laws as to Y and Z, even though the state scheme actually is silent as to Y and Z. But how do you get around the fact that in your own complaint, the complaint sets forth a few examples of states intervening on the very conduct that you find wrong? Not the collusive part, the denial of the telemetry. But that's very important. It's very important to be discerning about what the challenge conduct in this case is and what it is not. Now, the result of the challenge. And tell us then. Yes, certainly. Using the complaint. Yes. Tell us what the challenge conduct is. Sure. The challenge conduct in this case is the horizontal agreement to accept and deny coverage of particular claims in accordance with the association's recommendations. That is the challenge conduct. The result of the challenge conduct in this case is that most of the blue plans uniformly deny claims for telemetry. Now, some states do have independent review boards for individual claim denials. But, again, that's regulating the outcome of the challenge conduct here. And the whole point of the complaint is that those state reversals have not implicated, reached, disturbed, or affected the uniformity rule at all 20 times. But you agree, though, there are demonstrations that there's state regulation of conduct. No, we don't. No? No. That is state regulation of particular individual claim denials. We are not challenging here any particular claim denial. We are challenging the horizontal agreement to deny claims in lockstep with one another. Then if there are state laws that make it an unfair practice to engage in collusive conduct, your conduct, that conduct, not your conduct, that conduct would be regulated by state law, yes? No. And the reason, Judge Fischer, you spoke to this briefly. You rightly pointed out that the state insurance commissioner really doesn't regulate collusive conduct outside of a narrow set of categories. And those categories typically are joint rate making, rate setting, data pooling, right, things that lead. Isn't it enough, though, that in all these states that there are state antitrust statutes? No. Why not? There is no court that we're aware of that has applied the, has construed the McCarran exemption to implicate state antitrust laws. And I think there's a good reason for this. To what? I think there's a good reason for this, right? So if you go back to McCarran, I'm sorry, I'm way over time. Answer, Judge Fischer. Okay. If you go back to McCarran's animating concern, the concern was that the federal antitrust laws would make illegal joint rate setting activities that the states authorize. Right. Right? There's no concern about that sort of, you know, these two trains running into each other with respect to state antitrust laws, which run in parallel typically with the federal antitrust laws. So there would be nothing to gain from the perspective of Congress in drafting the statute from exempting the federal antitrust laws where state antitrust law applies. And, again, it goes back to that animating purpose, which is that states be permitted to authorize joint conduct that, in their judgment, is pro-competitive and fosters actuarial accuracy and solvency in the industry. Unless there are more questions, I'll go ahead and step down. Okay. Thank you for your audience. Thank you very much. Okay. We thank all counsel for their excellent briefing and their arguments, and we will take this matter under advisement.